Julie C. Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth A. Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin M. Osborne, State Bar No. 261367 (kevin@eko.law)
**ERICKSON KRAMER OSBORNE LLP**
959 Natoma Street
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, and JANE DOE 5, individually and on behalf of others similarly situated,

Plaintiffs,

vs.

UNITED STATES OF AMERICA, GOOGLE LLC, and X.AI Corp.,

Defendants.

Case No.: 5:26-cv-02624-VKD

**PLAINTIFFS' OPPOSITION TO DEFENDANTS GOOGLE LLC & X.AI CORP.'S JOINT MOTION TO DISMISS**

Judge: Hon. Virginia K. DeMarchi
Courtroom 2, 5th Floor

Date: November 17, 2026
Time: 10:00 a.m.

## TABLE OF CONTENTS


**I. INTRODUCTION ........ 1**

**II. RELEVANT FACTUAL ALLEGATIONS ........ 1**

**III. STANDARD OF REVIEW ........ 4**

**IV. ARGUMENT ........ 4**

A. Defendants Fail to Show Their Chatbots Deserve First Amendment Protection ........ 4

1. Defendants' Motion Fails to Show Their Chatbots' Speech Is Protected ........ 4
2. Defendants Focus Their Newsworthiness Attacks on the Wrong Facts ........ 7
3. The *Florida Star* Decision Does Not Save Defendants' Deficient Defense ........ 9

B. There Is No Section 230 Protection for Defendants' Chatbot-Created Content ........ 12

1. The Section 230 Defense Asserted Is Premature ........ 12
2. The Offending Disclosures Are Defendants' Own Content ........ 12

C. Plaintiffs Base Their UCL Claims on Suitable Facts and Theories ........ 16

1. Plaintiffs Allege Concrete Economic Injury and Have Standing ........ 16
2. The CCPA and FTCA Are Viable Predicates for Unlawful Conduct ........ 17
3. Defendants' Disclosures Violated the UCL's Unfair Prong ........ 19

D. Defendants Mischaracterize the Requirements of an Invasion of Privacy Claim ........ 20

1. The Information Defendants' Chatbots Disclosed Was Private Facts ........ 20
2. The Information Disclosed Was Not Newsworthy ........ 22
3. Plaintiffs Have a Privacy Right in Contact Information ........ 22

E. Defendants' Attacks on Plaintiffs' Negligence Claims Ignore Plaintiffs Allegations ........ 23

1. The Complaint Persuasively Alleges Misfeasance ........ 23
2. Plaintiffs Sufficiently Allege Proximate Causation & Damages ........ 24
3. Plaintiffs Validly Assert the CCPA Gives Rise to a Duty of Care ........ 25
4. A Claim for Negligent Infliction of Emotional Distress Is Warranted Here ........ 25

**V. CONCLUSION ........ 25**

## TABLE OF AUTHORITIES

**Cases**

*Arias v. Superior Ct.*, 46 Cal. 4th 959 (2009) .......... 18

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......... 4

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .......... 8, 17, 24

*Baugh v. CBS, Inc.*, 828 F. Supp. 745 (N.D. Cal. 1993) .......... 8

*Boquist v. Courtney*, 32 F.4th 764 (9th Cir. 2022) .......... 4, 23

*Bouck v. Meta Platforms, Inc.*, 2026 WL 810036 (N.D. Cal. Mar. 24, 2026) .......... 13

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) .......... 5

*Brown v. USA Taekwondo*, 11 Cal.5th 204 (2021) .......... 24

*Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (2011) .......... 23

*California v. Meta Platforms, Inc.* 186 F.4th 663 (9th Cir. 2026) .......... 12

*Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) .......... 12

*Catsouras v. Dep't of California Highway Patrol*, 181 Cal. App. 4th 856 (2010) .......... 22

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163 (1999) .......... 20

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) .......... 5

*Davidson v. Hewlett-Packard Co.*, 2021 WL 4222130 (N.D. Cal. Sept. 16, 2021) .......... 21

*Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012) .......... 18

*De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966 (2018) .......... 17

*Diaz v. Oakland Trib., Inc.*,
139 Cal. App. 3d 118 (Cal. Ct. App. 1983) ... 22

*Diaz v. Oakland Trib., Inc.*,
139 Cal.App.3d 118 (1983) ... 8, 21, 22

*Doe 1 v. JP Morgan Chase,*
742 F. Supp. 3d 387(S.D.N.Y. 2024)... 11

*Doe v. Gangland Prods., Inc.*,
730 F.3d 946 (9th Cir. 2013) ... 7, 22

*Doe v. Uber Techs., Inc.*,
2025 WL 80365 (9th Cir. Jan. 13, 2025) ... 23

*Dowbenko v. Google Inc.*,
582 F. App'x 801 (11th Cir. 2014) ... 15

*Dyroff v. Ultimate Software Grp., Inc.,*
934 F.3d 1093 (9th Cir. 2019) ... 14

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir 2008 ... 13

*Florida Star v. B.J.F.*,
491 U.S. at 524 (1989) ... 8, 9, 10, 11

*Forrest v. Meta Platforms, Inc.*,
737 F. Supp. 3d 808 (N.D. Cal. 2024) ... 12

*FTC v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) ... 19

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010) ... 19

*Garcia v. Character Techs., Inc.*,
785 F. Supp. 3d 1157 (M.D. Fla. 2025) ... 5

*Ginsberg v. Google Inc.*,
586 F.Supp.3d 998 (N.D. Cal. Feb. 18, 2022) ... 25

*Hill v. Nat'l Collegiate Athletic Assn.*,
7 Cal. 4th 1 (1994) ... 20

*I.C. v. Zynga, Inc.*,
600 F. Supp. 3d 1034 (N.D. Cal. 2022) ... 23

*In re Accellion, Inc. Data Breach Litig.*,
713 F.Supp.3d 623 (N.D. Cal. Jan. 29, 2024)... 24

*In re Anthem, Inc. Data Breach Litig.*,
162 F. Supp. 3d 953 (N.D. Cal. 2016) ... 20

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
806 F. Supp. 3d 1015 (N.D. Cal. 2025) ... 12

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........ 19

*In re Salesforce Customers Sec. Incident Litig.*,
2026 WL 2691455 (N.D. Cal. Sept. 14, 2026) ........ 24

*In re Sequoia Benefits & Ins. Data Breach Litig.*,
2024 WL 1091195 (N.D. Cal. Feb. 22, 2024) ........ 18

*In re Zoom Video Communications Inc. Privacy Litigation*,
525 F. Supp. 3d 1017 (N.D. Cal. 2021) ........ 13

*Jackson v. Mayweather*,
10 Cal. App. 5th 1240 (2017) ........ 7, 8, 22

*Jordan v. Paul Financial, LLC*,
745 F. Supp. 2d 1084 (N.D. Cal. 2010) ........ 18

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) ........ 16

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ........ 12

*Lozano v. AT&T Wireless Servs., Inc.*,
504 F.3d 718 (9th Cir. 2007) ........ 19

*Lugtu v. Cal. Highway Patrol*,
26 Cal. 4th 703 (2001) ........ 23

*M.G. v. Time Warner, Inc.*,
89 Cal.App.4th 623 (2001) ........ 8, 20

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
925 F.3d 1263 (D.C. Cir. 2019) ........ 15

*Michigan v. Lucas*,
500 U.S. 145 (1991) ........ 11

*Miles v. City Council of Augusta, Ga.*,
710 F.2d 1542 (11th Cir. 1983) ........ 5

*Molien v. Kaiser Found. Hosps.*,
27 Cal. 3d 916 (1980) ........ 25

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 5

*Moreno v. Hanford Sentinel, Inc.*,
172 Cal. App. 4th 1125 (2009) ........ 21

*NetChoice, LLC v. Bonta*,
152 F.4th 1002 (9th Cir. 2025) ........ 6, 7

*Nicole Reisberg et al. v. Renaissance Learning, Inc.*,
2026 WL 2678223 (C.D. Cal. Sept. 11, 2026) ........ 21

*O'Donnell v. Bank of Am., Nat'l Ass'n*,
504 F. App'x 566 (9th Cir. 2013) .......... 18

*O'Kroley v. Fastcase, Inc.*,
831 F.3d 352 (6th Cir. 2016) .......... 15

*Pace v. Baker-White*,
432 F. Supp. 3d 495 (E.D. Pa. 2020) .......... 14

*Padron v. Lara*,
2018 WL 2213462 (E.D. Cal. May 11, 2018) .......... 23

*Pangilinan v. Downey Sav. & Loan Ass'n*,
2011 WL 2837587 (N.D. Cal. July 18, 2011) .......... 19

*People v. Bryant*,
94 P.3d 624 (2004) .......... 8, 11

*Perkins v. Linkedin Corp.*,
53 F. Supp. 3d 1222 (N.D. Cal. 2014) .......... 13

*Pirozzi v. Apple Inc.*,
913 F. Supp. 2d 840 (N.D. Cal. 2012) .......... 4

*Rabin v. Google LLC*,
725 F. Supp. 3d 1028 (N.D. Cal. 2024) .......... 4, 12

*Reid v. Johnson & Johnson*,
780 F.3d 952 (9th Cir. 2015) .......... 19

*Rowland v. Christian*,
69 Cal. 2d 108 (1968) .......... 23

*Shulman v. Grp. W Prods., Inc.*,
18 Cal. 4th 200 (1998) .......... 7, 8, 22

*Sipple v. Chron. Publ'g Co.*,
154 Cal. App. 3d 1040 (Ct. App. 1984) .......... 21

*Smith v. Daily Mail Pub. Co.*,
443 U.S. 97 (1979) .......... 10

*Smith v. Wells Fargo Bank, N.A.*,
135 Cal. App. 4th 1463 (2005) .......... 18

*Smith v. YETI Coolers, LLC*,
754 F. Supp. 3d 933 (N.D. Cal. 2024) .......... 4

*Stasi v. Inmediata Health Grp. Corp.*,
501 F.Supp.3d 898 (S.D. Cal. Nov. 19, 2020) .......... 24

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
17 Cal. 4th 553 (1998) .......... 18

*Summers v. Delta Airlines, Inc.*,
805 F.Supp.2d 874 (N.D. Cal. Apr. 4, 2011) .......... 25

*Thomas v. Chicago Park Dist.*,
534 U.S. 316 (2002) ..... 12

*Twitter, Inc. v. Sessions*,
263 F. Supp. 3d 803 (N.D. Cal. 2017) ..... 10

*U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*,
489 U.S. 749 (1989) ..... 20

*Viner v. Sweet*,
30 Cal.4th 1232 (2003) ..... 25

*Virgil v. Time, Inc.*,
527 F.2d 1122 (9th Cir. 1975) ..... 8

*Williams-Sonoma, Inc. v. Amazon.com, Inc.*,
627 F. Supp. 3d 1072 (N.D. Cal. 2020) ..... 4

*Yeager v. Cingular Wireless LLC*,
627 F. Supp. 2d 1170 (E.D. Cal. 2008) ..... 7

**Statutes**

139 STAT. 656 § 2 ..... 1, 13, 25

15 U.S.C. § 45 ..... 23

18 U.S.C. § 3771 ..... 25

Cal. Code Civ. P. § 1798.100 ..... 20, 21, 25

Cal. Code Civ. P. § 1798.140 ..... 21

Cal. Code Civ. P. § 1798.150 ..... 20

Cal. Code. Civ. P. § 1798.175 ..... 20

Fed. R. Civ. P. Rule 12 ..... 4

## STATEMENT OF ISSUES TO BE DECIDED

Pursuant to the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California, Rule 7-4(a)(3), Plaintiffs ask the Court to rule on the following issues:

(1) Whether Defendants' have established that their artificial intelligence-based chatbots have a right to free speech under the First Amendment of the Constitution;

(2) Whether Defendants have established that their chatbots' responses constituted "speech" for purposes of the First Amendment;

(3) Whether responses by Defendants' chatbots about the private information of Jeffrey Epstein's victims were "newsworthy" under the First Amendment;

(4) Whether Defendants have established, on the pleadings, that the content Plaintiffs allege was generated by Defendants' chatbots was "created" by third parties for purposes of Section 230 of the Communications Decency Act;

(5) Whether Plaintiffs' allegations are adequately pleaded to establish standing, unlawful conduct, and unfair conduct under California's Unfair Competition Law;

(6) Whether Plaintiffs adequately plead that the Defendants' chatbots publicly disclosed private facts about them resulting in an invasion of privacy under California law; and

(7) Whether Plaintiffs adequately allege that Defendants owed them a duty of care and caused them harm under California's negligence tort.

## I. INTRODUCTION[1]

Defendants Google LLC ("Google") and X.AI Corp's ("xAI") (collectively "Defendants") chatbots revealed the fact that a woman was among Jeffrey Epstein's victims, described how another was groomed by Epstein, generated a link to a victim's email address, directed users to a victim's unredacted phone number, and provided specific private information that would allow anyone with an internet connection to identify and physically find victims. None of these revelations were in made the context of an article about Epstein's crimes, and all of them went well beyond what was earlier revealed about the victims by the U.S. government. These unchallenged allegations establish Defendants' liability under California law.

Defendants argue, however, that they are entitled to defenses under the First Amendment and Section 230 of the Communications Decency Act ("Section 230"). But the issues they raise supporting these defenses cannot be analyzed without the benefit if a factual record. The level of human involvement in the chatbots' functions, the full universe of disclosures, the possibility that the disclosures were third-party content, and the degree to which the information was already public are fact-heavy inquiries that can only be answered through discovery. Accordingly, these defenses are premature, and this Motion should be denied.

## II. RELEVANT FACTUAL ALLEGATIONS

Plaintiffs Jane Does 1-5 ("Plaintiffs") are victims of Jeffrey Epstein. ¶¶ 15-20, 95.[2] Unredacted files revealing their identities were disclosed by the U.S. Department of Justice ("DOJ") as a part of the Epstein Files Transparency Act ("EFTA") document releases of late 2025 and early 2026. ¶¶ 28-33. These files included their names, telephone numbers, emails addresses, physical addresses, occupations, photos, and other private information. ¶ 33. At the time it enacted the EFTA, Congress stated that such a disclosure would be "a clearly unwarranted invasion of personal privacy." ¶ 30 (citing 139 STAT. 656 § 2(c)(1)(A)). The

---

[1] In all quotations, all internal quotation marks, citations, and alterations have been removed, and all emphases added, unless otherwise noted.

[2] All citations using the "¶" symbol refer to paragraphs in Plaintiffs' First Amended Complaint, Dkt. No. 16 ("Complaint"), unless otherwise noted.

government responded to the disclosure by redacting approximately 10,000 records from its public online repository, ostensibly removing them from public view. ¶ 40.

Google's "AI Mode" is an artificial intelligence ("AI") chatbot that responds to user queries by running multiple searches in parallel and generating "unique," "conversational" responses that are "Google-created." ¶ 55. In response to queries about Plaintiffs, AI Mode generated responses containing private information drawn from multiple sources and connecting them to the Epstein investigation. ¶¶ 57-67. For example, in response to the prompt "who is [Jane Doe 4]?," AI Mode reported where she was born, described her work history and current occupation, and stated that she "appeared in communication logs declassified under the Epstein Files Transparency Act (EFTA), which detailed logistical and travel coordination involving Jeffrey Epstein." ¶ 66. It followed up by asking the user, "[w]ould you like to know more about … [o]ther individuals mentioned in the EFTA records?" *Id.* AI Mode responded to a query about another Jane Doe by acknowledging that she is an Epstein victim, disclosing her private information, and admitting that her information had been redacted from the DOJ's ETFA website. ¶ 67. Rather than keep her information private, it also offered a suggestion for where to go to find unredacted versions of documents that might still be available. *Id.* As to another Jane Doe, AI Mode responded that she appeared in the Epstein files and created a hyperlink to her personal email address. ¶ 57. It generated this response weeks after the DOJ and other sources had removed records referencing her. ¶¶ 58, 59. AI Mode continues to generate responses like these, even though Plaintiffs have informed Google that they are Epstein's victims and that the information in AI Mode's responses is being used to threaten and harass them. ¶ 69. Google refuses to desist from disclosing this information. *Id.*

xAI's Grok is also a chatbot. ¶ 71. It responds to user queries with unique, conversational answers using information drawn from numerous online sources. ¶¶ 71, 74. Like AI Mode, Grok continues to generate responses that disclose Epstein victims' private information even after that information has been removed from the government's EFTA website. ¶¶ 75-81. For example, Grok responded to a query about a Jane Doe by disclosing her profession, identifying her employer, and describing Epstein's efforts to groom her, thereby suggesting she is an Epstein

victim. ¶ 77. It responded to a query about another Jane Doe by stating the number of documents where her name appeared and referring users to other sources that apparently disclosed her phone number and apartment location. ¶ 79. In response to the queries, "Who is [Jane Doe 1]?" and "Where does she live?," Grok disclosed what she does, her city of residence and zip code, and offered to show a photograph of her. ¶ 76.

Defendants' disclosures were qualitatively different than the DOJ's disclosures, which consisted almost entirely of communications with or about the victims. *See* ¶¶ 57-67 (AI Mode stating the DOJ released communications and emails involving Jane Does 1-5); ¶¶ 75-81 (Grok stating the same). This is because the chatbots pull the information in their response from multiple sources and synthesize unique responses. AI Mode and Grok added details, including where several of the Plaintiffs were originally from (¶¶ 63, 66, 78), information about their family members (¶ 68), who employed them (¶ 77), their status as victims (¶ 67), details regarding how they were groomed (¶ 77), and other information that would allow anyone with an internet connection to identify and physically find numerous victims (¶¶ 68, 82). They also generated a link to a one Plaintiff's email address that was not in the DOJ release (¶ 57) and directed users a victim's phone number that was redacted from the release (¶ 81). Many of the sources the chatbots cited did not, in fact, contain this information at all. ¶¶ 58, 61, 79, 80.

Knowing that their affiliation with the Epstein investigation and their private information are both easily accessible on two of the world's most used websites causes the Plaintiffs continuous anxiety, fear, and humiliation. ¶ 91. They have been harassed and threatened, and their pre-existing trauma has been exacerbated. *Id*. They live with a sense of powerlessness caused by their inability to control the narrative of their abuse. *Id*. This will continue as long as AI Mode and Grok continue to make these disclosures. ¶ 92.

Based on these allegations, Plaintiffs assert claims against Defendants under California state law. They allege illegal and unfair conduct in violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq*. ("the UCL"); invasion of privacy; negligence; and negligent infliction of emotional distress. They seek damages and an injunction compelling Defendants to cease displaying their private information. ¶ 101. They allege concrete economic loss attributable

to Defendants' disclosures, paying for therapy, the costs of relocating, and for services that mitigate the effects of online reputational harm. ¶¶ 93, 128, 172.

## III. STANDARD OF REVIEW

To withstand a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). If the court's analysis requires a factual record beyond the complaint, the motion should be denied. *See Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 849 (N.D. Cal. 2012) (ruling it was premature at the pleadings phase to decide whether the Section 230 applied "based on the scant record before the Court"); *Smith v. YETI Coolers, LLC*, 754 F. Supp. 3d 933, 945 (N.D. Cal. 2024) (whether plaintiff had a legally protected privacy interest "is precisely the type of fact-specific inquiry that cannot be decided on the pleadings").

"Ordinarily affirmative defenses may not be raised by motion to dismiss." *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022); *see also Williams-Sonoma, Inc. v. Amazon.com, Inc.*, 627 F. Supp. 3d 1072, 1079 (N.D. Cal. 2020) ("affirmative defenses do not warrant dismissal pursuant to Rule 12(b)(6) except in rare cases"). To dismiss a complaint based on an affirmative defense, the plaintiff must "admit all the ingredients of an impenetrable defense and that there can be no factual dispute over whether the defense will apply." *Rabin v. Google LLC*, 725 F. Supp. 3d 1028, 1031 (N.D. Cal. 2024).

## IV. ARGUMENT

### A. Defendants Fail to Show Their Chatbots Deserve First Amendment Protection

#### *1. Defendants' Motion Fails to Show Their Chatbots' Speech Is Protected*

In their Motion, Defendants ask the Court to extend the First Amendment to a novel medium in a novel context—that is, machine-driven responses from non-human AI chatbots that disclose private information about sexual abuse survivors. And they do so flippantly, with next to no support for or recognition of the gravity of their request. But to succeed here, it is incumbent upon Defendants to demonstrate (1) that their chatbots' outputs are "expressive," meaning they communicate ideas in the same way as already-protected forms of expression; (2) that the companies, not the AI itself, are the proper rights-holder; and (3) that the connection between

human editorial judgment and the AI's output is not so attenuated as to sever the constitutional link to protected speech. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011); *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ("*Moody*"). Defendants do none of this work.

"The power to publish thoughts, no less than the power to speak thoughts, belongs only to human beings […]." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 392 fn. 7 (2010) (Scalia, J., concurring) (explaining a corporation only "speaks" through a human being authorized to speak on behalf of the other human beings who formed that association). No court has directly held that a chatbot possesses First Amendment free speech rights. To the contrary, the only case to consider whether a chatbot has free speech rights found it did not. In *Garcia v. Character Techs., Inc.*, the court rejected Google's argument that its chatbot, Character A.I., enjoyed free speech rights under the First Amendment. 785 F. Supp. 3d 1157, 1176 (M.D. Fla. 2025). "Character A.I., a chatbot, is not a 'person' and is therefore not protected by the Bill of Rights." *Id.* at 1176 fn. 8 (citing *Miles v. City Council of Augusta, Ga.*, 710 F.2d 1542, 1544 fn. 5 (11th Cir. 1983) (refusing to hear First Amendment claim on behalf of Blackie the Talking Cat, as a cat "cannot be considered a 'person' and is therefore not protected by the Bill of Rights")).[3] The Motion makes no mention of *Garcia*.

Defendants' lead authority deals only with the social media feeds and search engines at issue in those cases, not chatbots at issue here. In *Moody v. NetChoice, LLC*, the high court addressed Facebook and YouTube's algorithm-powered homepage feeds. 603 U.S. 707, 726-28 (2024) ("*Moody*"). The Court found the record supported that the two platforms' feeds directly reflect the companies' content-moderation policies—decisions made <u>by humans</u> entitled to First Amendment protection. *Id.* at 734-38. *Moody*'s limited scope is clear. *Id.* at 734 (holding is specific to "the platforms' application of their content-moderation policies to the feeds that were

---

[3] *See also*, Tim Wu, *Machine Speech*, 161 UNIV. PA. L. REV. 1495, 1503 (2013) ("machines today remain like Blackie the cat, property of their masters and owners. They remain, to the law at least, dumb beasts."); Peter N. Salib, *AI Outputs Are Not Protected Speech*, 102 WASH. UNIV. L. REV. 83, 111 (2024) ("Al outputs are either not speech or, insofar as they are speech, the speech does not belong to anyone with First Amendment rights.")

the focus of the proceedings below”). As Justice Barrett’s concurrence noted, the majority opinion did not address the different outcomes that may result in cases where a human does not dictate what speech to express but rather, “a platform’s algorithm just presents automatically to each user whatever the algorithm thinks the user will like.” 603 U.S. at 746. “The First Amendment implications […] might be different for that kind of algorithm.” *Id*. She continued:

> And what about AI, which is rapidly evolving? What if a platform’s owners hand the reins to an AI tool and ask it simply to remove “hateful” content? If the AI relies on large language models to determine what is “hateful” and should be removed, has a human being with First Amendment rights made an inherently expressive choice not to propound a particular point of view? In other words, technology may attenuate the connection between content-moderation *actions* (*e.g*., removing posts) and human beings’ constitutionally protected right to *decide for themselves* the ideas and beliefs deserving of expression, consideration, and adherence. So the way platforms use this sort of technology might have constitutional significance.

*Id*. (original emphasis).

In *NetChoice, LLC v. Bonta*, the Ninth Circuit analyzed other social media platforms’ feeds under *Moody* and noted its limited holding, heeding Justice Barrett’s concurrence. 152 F.4th 1002 (9th Cir. 2025). “The First Amendment analysis is fact intensive and will surely vary from platform to platform.” *Id.* at 1014 (quoting *Moody*, 603 U.S. at 747 (Barrett, J., concurring)). “The unique design of each platform and its algorithm affects whether the algorithm at issue is expressive.” *Id.* The Ninth Circuit reiterated the spectrum of possible technologies (and possible varying outcomes under the First Amendment) illustrated by Justice Barrett in *Moody*. *Id.* at 1014 (citing *Moody*, 603 U.S. at 736 n. 5, and 746 (Barrett, J., concurring)). The Ninth Circuit went farther, stating that algorithms that “reflect users’ revealed preferences to them” are “probably not expressive [speech]” under the First Amendment. *Id.*

Under *NetChoice, LLC v. Bonta*, chatbots like AI Mode and Grok are precisely the kind of automated, non-human-directed outputs that fall outside First Amendment protection. As Justice Alito’s observed in his concurrence in *Moody*, “when AI algorithms make decisions, even the researchers and programmers creating them don’t really understand why the models they

have built make the decisions they make" (603 U.S. at 795), underscoring that AI-generated outputs are not the product of the human "choice" that the First Amendment protects.[4]

Here, Defendants make no showing—no argument, no authority, and no analogy—to persuade the Court that their chatbots compare to the algorithms at issue in *Moody*. They merely claim their "judgments about what third-party content to include in search responses are protected by the First Amendment," without any explanation as to who (or what) makes these judgements. Mot. p. 10. They therefore fail to establish that the First Amendment applies at all. This leaves the Court little choice but to waive off Defendants' First Amendment defense. "At this stage of the litigation, where the court may only look at the allegations in the complaint and must view those allegations in the light most favorable to the plaintiff, the court cannot make such a determination." *Yeager v. Cingular Wireless LLC*, 627 F. Supp. 2d 1170, 1175 (E.D. Cal. 2008) (denying motion to dismiss based on First Amendment defense); *see also NetChoice, LLC v. Bonta*, 152 F.4th at 1014 (upholding district court's ruling that it needed "more information" about the particular algorithms and feeds to adjudicate whether they were "expressive").

*2. Defendants Focus Their Newsworthiness Attacks on the Wrong Facts*

Even assuming the First Amendment applied to the outputs of the chatbots at issue here, the Motion still fails. To dismiss a plaintiff's California law claims[5] based on a First Amendment defense, a court must determine, based on the complaint alone, that the information disclosed was "newsworthy." *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 214-215 (1998). The movant must show that the particular fact disclosed, within the context of the disclosure, served a legitimate public concern. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 959 (9th Cir. 2013) ("*Gangland*"). In analyzing newsworthiness, courts "balance the public's right to know against the plaintiff's privacy interest." *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1257 (2017); *see*

---

[4] The other case the Motion relies on, *Zhang v. Baidu.com Inc.*, is an order from the Southern District of New York, which predates *Moody* by a decade. 10 F.Supp.3d 433 (S.D.N.Y. 2014). It is specific to the search engine at issue in that case and does not address artificial intelligence or chatbots in any way. *Id.* at 438-39. It has neither precedential nor persuasive value here.

[5] Neither Defendant disputes that California law applies to their conduct.

*also Bartnicki v. Vopper*, 532 U.S. 514, 533 (2001) (declining to extend First Amendment protection to disclosures of "purely private concern"). A protective "line is to be drawn" at the point the "material revealed ceases to have any substantial connection to the subject matter of the newsworthy report." *Jackson,* 10 Cal. App. 5th at 1257 (citing *Shulman*, 18 Cal. 4th at 215); *see also Virgil v. Time, Inc.*, 527 F.2d 1122, 1129 (9th Cir. 1975) (adopting "line to be drawn" definition for matters of legitimate public interest). The newsworthiness of a particular publication is "largely a question of fact, which a jury is uniquely well-suited to decide." *Diaz v. Oakland Trib., Inc.*, 139 Cal.App.3d 118, 133 (1983).

The particular facts disclosed by Defendants' chatbots are not matters of public concern whatsoever; they are purely private information about private people. *See Baugh v. CBS, Inc.*, 828 F. Supp. 745, 755 (N.D. Cal. 1993) (while issue of domestic violence and the victim's story was newsworthy, the "personal involvement of [the] plaintiff in an incident of domestic violence was not newsworthy as a matter of law"); *Diaz*, 139 Cal.App.3d at 133 (person's sexual identity was not newsworthy as a matter of law simply because plaintiff held a public role); *M.G. v. Time Warner, Inc.*, 89 Cal.App.4th 623, 633-36 (2001) (jury could find plaintiffs' identities in publications on child molestation was not newsworthy); *People v. Bryant*, 94 P.3d 624, 635 (2004) (an alleged sexual assault victim's sexual conduct "is even more private than a victim's identity, which the [Supreme] Court held was of utmost importance in *Florida Star*").

Defendants claim that the subject of their disclosures is immaterial to the newsworthiness analysis, which should instead focus on "the crime, the investigation, the government record." Mot. at 8 (citing *Florida Star*, 491 U.S. at 537). This argument fails. By this logic, <u>everything</u> in the Epstein files is newsworthy simply because the Epstein files, writ large, were newsworthy. If that were so, nothing in the Epstein files deserves privacy from the public's eye—not photos of children, not explicit videos, and not the private information of victims—because it is all newsworthy. But Congress explicitly legislated the opposite, stating the disclosure of victims' private information would be a "clearly unwarranted invasion of personal privacy." ¶¶ 30, 38.

Beyond being illogical, Defendants' view on newsworthiness is also foreclosed by controlling Ninth Circuit law. *See Gangland*, 730 F.3d at 959 ("The newsworthiness inquiry

focuses on the particular fact at issue that was disclosed, not on the general topic of the publication."); *see also id*. at 959-60 (notwithstanding newsworthiness of gangs violence, there was a reasonable probability that jury would find the disclosure of plaintiff's identity was not newsworthy). *Florida Star* hurts, rather than helps, Defendants here. In *Florida Star*, the victim's personal information was newsworthy only within in the context of the news article in which it appeared. 491 U.S. 536-37. Defendants do not contend that their chatbots' responses were made within the context of a newsworthy article. They were not. *See* ¶¶ 57-59, 66-67, 76-77, 79. Plaintiffs take no position on Defendants' right to publish articles about the Epstein investigation, but a response to the prompts "Who is [Jane Doe 1]?" and "Where does she live?" reveals private content in an invasive context—not newsworthy content in a newsworthy context.

*3. The Florida Star Decision Does Not Save Defendants' Deficient Defense*

Defendants rely heavily on *Florida Star* for a litany of arguments. At first blush, this case may appear to mirror *Florida Star*. But a closer look reveals key distinctions that command a different outcome. In *Florida Star*, the Supreme Court examined a Florida statute creating *per se* civil liability for press publications that disclosed rape victims' names in "instruments of mass communication." 491 U.S. at 526. Under this law, a rape survivor sued a local Florida newspaper and obtained a verdict in her favor at trial. *Id*. at 528-29. After appeal, the case went to the Supreme Court, which analyzed whether the statute violated the First Amendment. The Court struck it down based on three conclusions. First, the statute was not narrowly tailored because it imposed damages even on those who obtained the content of their stories legally. *Id*. at 538-39. Second, it applied a negligence *per se* standard where "liability follows automatically from publication," without regard for whether the particular disclosure was "highly offensive." *Id*. at 539-40. And third, the law applied unevenly to different press outlets, imposing liability on a publisher of a mass communication but not other publishers. *Id*. at 540-41.

The differences between the issues presented in this Motion and *Florida Star* are apparent. To start, *Florida Star* was decided on a complete record after a full trial on the merits. 491 U.S. at 528. This is significant here because whether the alleged disclosures qualify for First Amendment protection depends on their substance. *Twitter, Inc. v. Sessions*, 263 F. Supp. 3d

803, 809 (N.D. Cal. 2017). In *Florida Star*, it was known that the publication involved one article, the contents of which were seen by all parties. 491 U.S. at 526. Here, Plaintiffs only know the substance of a sliver of Defendants' disclosures. Another difference is that *Florida Star* invalidated a broad state law, which barred disseminating the name of any rape victim, regardless of who the victim was and what the crime involved. 491 U.S. at 526 fn. 1. Plaintiffs here seek a narrower remedy, aimed at preventing two specific websites from disclosing specific information about a precisely defined group of approximately 100 identifiable women. ¶¶ 96, 101.

Additionally, *Florida Star* is self-limiting. The ruling repeats a mantra: "our holding today is limited." 491 U.S. at 541; *see also id.* at 530 (the Court resolves "this conflict only as it arose in a discrete factual context"); *id.* at 532 (the "future may bring scenarios which prudence counsels our not resolving anticipatorily"); *id*. at 533 ("the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case"). Most notably, *Florida Star* explicitly leaves open the possibility that the First Amendment will not protect disclosures in the proper context, stating, "in a proper case, imposing civil sanctions for publication of the name of a rape victim might be so overwhelmingly necessary to advance these interests as to satisfy the *Daily Mail* standard." 491 U.S. at 537.

Even if these fundamental distinctions and limitations didn't exist, *Florida Star*'s three-part analysis shows the relief Plaintiffs seek is constitutional. The test asks: (1) whether the disclosed information was obtained lawfully, (2) whether the information was a "matter of public significance," and (3), if the answers to the first two questions are yes, whether the restriction on speech is nevertheless constitutional because it is narrowly tailored and furthers an "interest of the highest order." 491 U.S. at 533 (citing *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97 (1979)). If the answer to either of the first two questions is no, the speech is not protected. *Id*. As Plaintiffs do not currently allege that the means by which Defendants came to possess the victims' private information was unlawful, the analysis below begins with the second question.

The answer is a resounding no—the victims' private information in this case is clearly not a matter of "public significance." Unlike in *Florida Star*, where the disclosure was limited to

the victim's name, Defendants disclosed (and continue to disclose) a litany of facts about the victims that allow users to affirmatively identify them, contact them, and find their physical location. There is no public significance of this information. Moreover, in *Florida Star*, the victim's name was disclosed in the context of an article about a publicly significant crime. *See* 491 U.S. at 536-537. The disclosures here are stripped of any such context. They state nothing about Epstein's crimes or the investigation, instead only disclosing information about the victims. *See*, *e.g.*, ¶¶ 57-67, 75-81. These details, isolated from the larger story, are so obviously private that Congress labeled them as such in the text of the EFTA. 139 STAT. 656 § 2(c)(1)(A). This information, devoid of any context or connection to the Epstein investigation, cannot conceivably be treated as publicly significant.

The third question of *Florida Star*, assuming *arguendo* the first two questions are answered in the affirmative, confirms the constitutionality of Plaintiffs' requested relief. An injunction here would not only protect of victims' privacy but also "encourage victims to report sexual assault, and further the prosecution and deterrence of sexual assault," interests of the highest order. *Bryant*, 94 P.3d at 626; *see also Michigan v. Lucas*, 500 U.S. 145, 150 (1991) ("rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy"). The need for this relief is magnified by the fact that, unlike *Florida Star*, this case involves abuse by "an internationally-recognized" figure, heightening both the threat posed to victims by disclosure and the interest in protecting their privacy. *Bryant*, 94 P.3d at 626.

Furthermore, the relief Plaintiffs seek has a proven path. In *Doe 1 v. JP Morgan Chase Bank, N.A.*, an Epstein victim asked the district court to deny the New York Times access to information identifying her in court filings, because "her identity as a survivor of sexual assault as well as her related psychological and emotional wellbeing overcome the First Amendment presumption of access." 742 F. Supp. 3d 387, 397 (S.D.N.Y. 2024). The court acknowledged that First Amendment rights attached to the filings, but held that "Doe's interest in maintaining the secrecy of her identity overcomes the First Amendment and common-law presumption of access." *Id*. at 399. The court fashioned a remedy where any information in the filings that might be used to identify Doe (or any of the other Epstein victims) be redacted from any public filings.

*Id.* at 399. A "narrowly drawn" remedy with "reasonable and definite standards" is similarly feasible here. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002). Accordingly, the remedy Plaintiffs seek here does not violated Defendants' right to free speech.

**B. There Is No Section 230 Protection for Defendants' Chatbot-Created Content**

*1. The Section 230 Defense Asserted Is Premature*

Like the First Amendment, Section 230 provides an affirmative defense. *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 738 (9th Cir. 2024). Defendants, therefore, bear the burden of showing that it applies. *Forrest v. Meta Platforms, Inc.*, 737 F. Supp. 3d 808, 815 (N.D. Cal. 2024) (motion to dismiss based on Section 230 denied where there was a "factual dispute" as to whether Meta was a content creator). "Plaintiffs do not need to plead facts that would *prove* (or even plausibly suggest) that Google's affirmative defense does not apply; they simply need to plead facts demonstrating a potential factual dispute that could affect whether the defense applies." *Rabin v. Google LLC*, 725 F. Supp. 3d 1028, 1031 (N.D. Cal. 2024) (original emphasis)

At the pleadings phase, courts are increasingly hostile to Section 230 defenses. *See Rabin*, 725 F. Supp. 3d 1028; *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 806 F. Supp. 3d 1015, 1033 (N.D. Cal. 2025) ("Section 230 is an affirmative defense that does not compel dismissal at the pleading stage unless the plaintiff pleads itself out of court"); *see also California v. Meta Platforms, Inc.* 186 F.4th 663, 676 (9th Cir. 2026) (upholding order denying motion to dismiss and holding that "section 230 provides a defense to liability, not immunity from suit"). As discussed below, there are numerous fact and merit-based questions raised by the asserted Section 230 defense that cannot be answered on the pleadings.

*2. The Offending Disclosures Are Defendants' Own Content*

There is no Section 230 defense for Defendants, as their involvement includes and goes beyond materially contributing to the offending content—their chatbots were its creators.

<u>A Content's Creator Has No Section 230 Defense</u>. As a matter of settled Ninth Circuit law, one who generates their own content has no protection for that content under Section 230. *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) (no defense to negligent design claim that "neither treat[ed] Snap as a publisher or speaker nor rel[ied] on information provided by another

information content provider”). In *Perkins v. Linkedin Corp.*, the defendant had no Section 230 defense for what plaintiff alleged was “new, original, and unique content created and developed in whole or in part by LinkedIn.” 53 F. Supp. 3d 1222, 1247 (N.D. Cal. 2014).

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is responsible, in whole or in part for creating or developing, the website is also a content provider.

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1165 (9th Cir 2008. Similarly, in *In re Zoom Video Communications Inc. Privacy Litigation*, the court held that Section 230 did not provide a defense where the claims stemmed from the platform’s own conduct, rather than the content third parties created. 525 F. Supp. 3d 1017 (N.D. Cal. 2021).

<u>Material Contribution Is Enough</u>. A defendant need not be the sole creator of content to lose its Section 230 defense—it need only materially contribute to the offending content. *Roommates.Com*, 521 F.3d at 1168. In *Forrest v. Meta Platforms, Inc.*, the court denied a motion to dismiss where the plaintiff alleged Facebook ads were generated in part using Meta’s generative AI tools. 737 F. Supp. 3d 808, 818 (N.D. Cal. 2024). Similarly, in *Bouck v. Meta Platforms, Inc.*, Meta moved to dismiss claims that it aided advertisers of fraudulent investment schemes, arguing, “the offending content was exclusively provided by the scammers.” 2026 WL 810036, at *4 (N.D. Cal. Mar. 24, 2026). The court denied the motion based on allegations that Meta’s AI tool selected images and copy from content provided by the scammers, mixed and matched that content, and altered the content to optimize its advertising performance *Id*.

<u>The Allegations Preclude a Section 230 Defense</u>. The allegations here that AI Mode and Grok create the offending content are too numerous to count. Plaintiffs allege that Defendants “display Class members’ private information in AI-generated content” (¶ 5); that they are “responsible for the content [they] generate[] and publish[]” (¶¶ 22, 23); that they are “content generators that package victim PII as part of a narrative output” (¶ 88); and that they “are not simply operating neutral platforms of other creators’ content; they […] generate unique content” (¶ 123, 167). Plaintiffs allege AI Mode “generates a single, conversational answer as unique,

Google-created content" (¶ 55); and Grok "writes text, or generates images or video by selecting the most likely next token to form coherent and contextually relevant responses" (¶ 71).

Plaintiffs further allege that Defendants provide more than a regurgitation of the content disclosed by the DOJ. They also synthesize information from various sources[6] to disclose additional information, telling users where the Jane Does live (¶ 66), where they are from (¶¶ 63, 66), what they do for a living (¶ 63, 66), and who they are related to (¶ 68). They even create links to allow users to reach out directly. ¶ 57. This is all in addition to confirming their inclusion in the Epstein files. ¶¶ 60, 63, 75, 66, 67. These extra steps materially contribute to the offending content, as they allow users to affirmatively identify and physically find the Jane Does. If the chatbots responded to the question "does Jane Doe appear in the Epstein files?" with a simple, "yes," that would be of no material contribution. But the Complaint shows they do substantially more, going so far as to generate new research leads so users can get even more of their private information. ¶¶ 66, 67. This is materially different from the information disclosed elsewhere. By stating information in ways that existed nowhere else, Defendants "created" content under Section 230 and have no defense. *See Pace v. Baker-White*, 432 F. Supp. 3d 495, 507 (E.D. Pa. 2020) (exploring the definition of "creation" and precluding defense where content was "original, having had no existence prior to their being authored by Defendants").

<u>Defendants' Ill-fitting Arguments and Authorities</u>. Defendants' central argument in support of Section 230 defense is that "aggregating and reformatting" content that exists in other places and in other forms is not a material contribution. Mot. at 14. There is no authority for this argument and its logic, if applied, would raise Section 230's defense to a level never intended.

This case is different from every authority Defendants cite. In *Dyroff v. Ultimate Software Grp., Inc.*, the plaintiff overdosed from heroin bought from another individual on the defendant's social networking site. 934 F.3d 1093, 1095 (9th Cir. 2019). The Section 230

---

[6] As noted above, Plaintiffs' cite several instances of AI Mode and Grok citing to sources that did not include the information the chatbots disclosed. ¶¶ 58, 61, 79, 80. There is, therefore, a factual question regarding whether there was even a third party that the chatbots' responses considered. This question cannot be resolved against Plaintiffs on the pleadings.

defense applied because the site published content exactly as it was written by the third parties. *Id*. at 1095; *see also Dowbenko v. Google Inc.*, 582 F. App'x 801, 803 (11th Cir. 2014) (same). The plaintiff in *O'Kroley v. Fastcase, Inc.* only alleged contribution to the offending content in the form of "removing spaces and altering font." 831 F.3d 352, 355 (6th Cir. 2016). Section 230 applied because the content otherwise appeared exactly as a third party drafted it. *Id*. ("Google did not add the [allegedly offending] ellipsis to the text. It was already in the Texas Advance Sheet's case preview.") Similarly, in *Marshall's Locksmith Serv. Inc. v. Google, LLC*, another out-of-circuit opinion, the plaintiffs alleged Google was creating content by converting "third-party indicia of location into pictorial form" by taking the address provided by a business and pinpointing it on a map. 925 F.3d 1263, 1271 (D.C. Cir. 2019). The complaint was dismissed because, as the plaintiffs acknowledged, "the underlying information [was] entirely provided by the third party." *Id*. at 1269. None of these cases alleged the offending content was generated from the defendant's own synthesis and reinterpretation of information. *Cf. Bouck*, 2026 WL 810036, at *4 (no Section 230 defense where defendants "participated in the construction" of the offending content). Furthermore, none of these cases addressed content created by a chatbot. Thus, these authorities fail to support the central argument at issue.

Nor is there logical support for Defendants' argument. By their reasoning, they should be granted "immunity" under Section 230 because every word in their chatbots' responses was also a word on some other combination of websites at some time prior. But by this logic, no content is "created" for purposes of Section 230 if it pre-existed in another form. To allow this defense would stretch Section 230 past its breaking point, creating a defense for every speaker of any content that previously existed somewhere else in some other form. *See Ecclesiastes* 1:9 (King James) ("there is nothing new under the sun"). For this reason, the authors of Section 230 have gone on record stating the statute does not protect chatbots. *See* Cristiano Lima-Strong, *AI Chatbots Won't Enjoy Tech's Legal Shield, Section 230 Authors Say*, WASH. POST (Mar. 17,

2023)[7] (quoting Sen. Ron Wyden's conclusion that AI chatbots "should not be protected by Section 230. And it isn't a particularly close call.")

**C. Plaintiffs Base Their UCL Claims on Suitable Facts and Theories**

*1. Plaintiffs Allege Concrete Economic Injury and Have Standing*

Based on an incomplete reading of the Complaint, Defendants argue Plaintiffs allege no economic injury attributable to them and lack standing for a claim under the USL. While paragraph 91 of the Complaint enumerates principally non-economic injuries, it does not exhaust the injuries attributable to Defendants. Plaintiffs specifically allege out-of-pocket expenses for counseling, reputation management, relocation, changes to contact information, and other measures necessary to mitigate harm caused by Defendants. ¶ 93. They also expressly allege that Google's (¶ 128) and xAI's (¶ 172) conduct caused economic injury. *See also* ¶¶ 140, 148, 155, 184, 192, 199 (expenditures, including legal expenses, incurred seeking removal of Plaintiffs' information). Counts II and VI incorporate these allegations. ¶¶ 113, 157. These allegations support standing under the UCL. A plaintiff loses money or property when required to enter into a transaction costing money that otherwise would have been unnecessary. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011). Read as a whole, the Complaint's allegations plausibly connect actual mitigation expenditures—not merely emotional distress or anticipated future expenses—to Google and xAI's ongoing disclosure practices. *See* ¶¶ 92-93, 140, 184.

The government's initial disclosure does not negate that causal connection. *See Kwikset*, 51 Cal. 4th at 326-27 (UCL standing is not defeated merely because another causal factor may exist). Plaintiffs allege that AI Mode and Grok continued generating victim-identifying responses after the underlying information had been withdrawn or redacted, and that Google and xAI independently perpetuated Plaintiffs' injuries and prompted out-of-pocket expenditures to pursue removal. ¶¶ 75-76, 80-84, 180, 184, 192, 199. Plaintiffs thus tie their mitigation expenses to Google and xAI's own continuing conduct.

---

[7]The article, last viewed July 15, 2026, is available at: available at: https://www.washingtonpost.com/politics/2023/03/17/ai-chatbots-wont-enjoy-techs-legal-shield-section-230-authors-say/.

*2. The CCPA and FTCA Are Viable Predicates for Unlawful Conduct*

The Complaint pleads that Defendants violated, and continue to violate, the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §§ 1798.100 *et seq.*, and Section 5(a) of the Federal Trade Commission Act ("FTCA"). ¶¶ 115-18. Misstating the law, Defendants argue these are improper bases for a claim under the UCL's unlawful prong.

<u>The CCPA as a Basis for an Unlawful Claim</u>. Defendants first argue that the CCPA—a statute designed to protect consumer privacy—somehow forecloses UCL liability for their disclosures of Plaintiffs' private information. It does not. A state statute forecloses a UCL action only where it makes the challenged conduct "lawful, for all purposes, under all regulations." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 987 (2018). That is a high bar, and it is not met here. The CCPA repeatedly and expressly makes clear that it does not supplant other law. *See* Cal. Civ. Code § 1798.150(c) (its limitations on private rights of action "shall not be construed to relieve any party from any duties or obligations imposed under other law"); *id.* § 1798.175 (CCPA is intended to "supplement," not supplant, "existing laws relating to consumers' personal information"). And in a conflict, "the provisions of the law that afford the greatest protection for the right of privacy for consumers shall control." *Id.* In other words, the CCPA itself provides that, if the UCL affords greater protection, it controls.

<u>Violation of the CCPA.</u> Defendants' "sensitive information" argument confuses a CCPA subcategory with the whole. *See* Mot. at 18. Under the CCPA, "personal information" includes real names, postal and email addresses, geolocation data, professional information, and "[i]nferences drawn" from such information "to create a profile about a consumer." Civ. Code § 1798.140(v)(1)(A), (G), (I), (K). Plaintiffs allege Defendants disclosed precisely such information. ¶¶ 15–19, 57, 65–66, 76, 79–81, 123, 167. The CCPA's proportionality and reasonable-security obligations apply to all personal information, *id.* § 1798.100(c), (e); *Gardiner v. Walmart Inc.*, 2021 WL 2520103, at *3 (N.D. Cal. Mar. 5, 2021), applied only the narrower definition governing the private data-breach remedy. Moreover, the CCPA's subcategory for "sensitive personal information" includes the contents of private communications and information concerning a consumer's health or sex life, Cal. Civ. Code §

1798.140(ae)(1)(E), (ae)(2)(B)–(C)—material on which Defendants' chatbot responses allegedly draw. ¶¶ 26, 60, 63, 65, 77. Plaintiffs sufficiently allege facts falling with the scope of the CCPA.

Also contrary to Defendants' argument, the disclosed information is not "publicly available." *See* Mot. at 17–18. That exclusion reaches only information "lawfully made available from federal, state, or local government records," or that a business "has a reasonable basis to believe is lawfully made available to the general public by the consumer or from widely distributed media." Civ. Code § 1798.140(v)(2). Neither condition is met. First, the survivor-identifying information was released in violation of the EFTA's privacy protections and then withdrawn or redacted. Thus, when Defendants later generated chatbot responses, the identifying information was neither lawfully public nor available "from" government records. ¶¶ 30, 37–38, 58–59, 75–76, 80, 180. Second, Defendants could not reasonably believe otherwise in light of the specific removal requests identifying Plaintiffs as survivors. ¶¶ 59, 64, 69, 83, 127, 171.

<u>The FTCA as a Basis for an Unlawful Claim</u>. Defendants' FTCA private-right argument likewise misstates California law. Mot. at 17. "Virtually any law—federal, state or local—can serve as a predicate for a [§ 17200] action," *Smith v. Wells Fargo Bank, N.A.*, 135 Cal. App. 4th 1463, 1479-80 (2005), whether or not that law supplies a private right of action, *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 562 (1998), superseded by statute on other grounds, *Arias v. Superior Ct.*, 46 Cal. 4th 959, 977 (2009). Section 5 is accordingly a recognized UCL predicate. *See, e.g.*, *Jordan v. Paul Financial, LLC*, 745 F. Supp. 2d 1084, 1100 (N.D. Cal. 2010); *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012). Defendants' cases are inapposite. *See O'Donnell v. Bank of Am., Nat'l Ass'n*, 504 F. App'x 566 (9th Cir. 2013) (national bank expressly exempt from FTC jurisdiction); *In re Sequoia Benefits & Ins. Data Breach Litig.*, 2024 WL 1091195, at *8 (N.D. Cal. Feb. 22, 2024) (following *O'Donnell* as to financial-services entity).

<u>Violation of the FTCA.</u> Defendants argue the Complaint identifies no FTCA duty because it does not describe the referenced FTC publications. Mot. at 18-19. But unfairness under the FTCA is statutory: an act is unfair if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by

countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). Agency guidance, such as an FTB publication, is merely evidence and "may not serve as a primary basis" for that determination. *Id.*

*3. Defendants' Disclosures Violated the UCL's Unfair Prong*

This is not the "rare" case in which unfairness can be decided as a matter of law. *Reid v. Johnson & Johnson*, 780 F.3d 952, 958 (9th Cir. 2015). Defendants' conduct is unfair under both the balancing and tethering tests. *Lozano v. AT&T Wireless Servs., Inc.*, 504 F.3d 718, 736 (9th Cir. 2007).

The balancing test weighs the "harm to the consumer against the utility of the defendant's practice," *Pangilinan v. Downey Sav. & Loan Ass'n*, 2011 WL 2837587, at *3 n.1 (N.D. Cal. July 18, 2011)—an analysis "not properly suited for resolution at the pleading stage." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1117 (N.D. Cal. 2015). Even if addressed at this stage, AI Mode and Grok are alleged to have disclosed Plaintiffs' addresses, phone numbers, employers, and family information to any internet user, causing actual unwanted contact, threats, harassment, renewed trauma, and mitigation expenses. ¶¶ 63, 66–69, 77–78, 82–84, 89, 91–93. Plaintiffs cannot avoid this harm: they never gave Defendants their information, cannot opt out, and made removal requests that Defendants ignored or refused. ¶¶ 59, 64, 83, 124–25, 168–69. Defendants' conclusory appeal to "matters of significant public interest," Mot. at 20, does not tip the balance: public access to information about Epstein's crimes does not require identifying his victims, and Defendants already have removal, filtering, and anonymization tools. ¶¶ 85–86, 121, 126, 165, 170. Nor can Defendants legally shift their blame to the government's initial release of the Epstein files, as liability under the UCL's unfair prong attaches to a defendant's own conduct that predictably facilitates harm. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155-58 (9th Cir. 2010) (creating and delivering unverified checks that facilitated third-party fraud); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1199 (10th Cir. 2009) (website that made confidential personal records publicly available; § 230 inapplicable). Here, Defendants' own products synthesize identities, victim status, professional details, locations, and live contact links into a single output. ¶¶ 55, 57, 65-66, 71, 76, 79-81, 123, 167. This is independently actionable. That

some scattered pieces of this information were public does not make their compilation and disclosure fair. *See U.S. Dep't of Just. v. Reps. Comm. for Freedom of Press*, 489 U.S. 749, 765 (1989) ("vast difference" between information found through "diligent search" and a "computerized summary located in a single clearinghouse of information").

Under the tethering test, Defendants' conduct also offends "legislatively declared policy," *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 989 (N.D. Cal. 2016), including California's constitutional right of informational privacy (*Hill v. Nat'l Collegiate Athletic Assn.*, 7 Cal. 4th 1, 20 & 35 (1994)); Congress's authorization to withhold victims' personally identifiable information from these very records (EFTA § 2(c)(1)(A)); the guarantee that crime victims be treated "with respect for the victim's dignity and privacy" (18 U.S.C. § 3771(a)(8)); and the CCPA's requirement that processing be "reasonably necessary and proportionate" (Civ. Code § 1798.100(c)). *See* ¶¶ 27, 30, 38, 122, 166; *see also* ¶¶ 121, 126, 165, 170. Finally, neither the unpleaded doxxing-statute's intent element nor the absence of a public policy requiring Defendants to affirmatively take down the subject information have any relevance here: tethering requires that the practice offend a declared policy, not that it independently violates the provision declaring it. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

### D. Defendants Mischaracterize the Requirements of an Invasion of Privacy Claim

#### *1. The Information Defendants' Chatbots Disclosed Was Private Facts*

Defendants assert that the DOJ's prior disclosure rendered the Plaintiffs' information "public" and therefore unactionable. They are wrong. Whether Plaintiffs have adequately alleged that the information Defendants disclosed is private for purposes of stating a claim is not as simple as Defendants pretend. If information that is discoverable by members of the public could never form the basis of a privacy claim, the caselaw on this question would be clear as day. But there is no such rule.

*M.G. v. Time Warner, Inc.* is instructive. 89 Cal. App. 4th 623 (2001) is instructive. There, the court was confronted with technically "public" information (the identities of youth baseball players who had competed for several years and received media attention) and yet found that defendant's disclosures (connecting those players to a coach accused of sexual assault)

plausibly violated the plaintiffs' privacy interests. *Id.* at 632. Even if the players' identities were technically "publicly available" the disclosure was not exempt from liability unless it was also newsworthy. *Id.* at 634-635. This analysis generally requires discovery (*id*. at 633) and is a fact-intensive inquiry reserved for the jury (*Diaz*, 139 Cal.App.3d at 133). Here, Defendants have failed to show that Plaintiffs lack a legitimate privacy interest in their identities and status as Epstein survivors, nor have they made a showing such disclosures are newsworthy.

Rather than engage in this complex analysis, Defendants rely on broad statements of law without any reference to the facts of the underlying cases. In fact, the cases they cite turned on <u>the plaintiff's</u> prior disclosure—where, having taken affirmative steps to disclose the facts at issue to the general public, the plaintiffs themselves rendered the information non-private and unactionable. In *Sipple v. Chron. Publ'g Co.*, 154 Cal. App. 3d 1040 (Ct. App. 1984), *Davidson v. Hewlett-Packard Co*., 2021 WL 4222130 (N.D. Cal. Sept. 16, 2021), and *Moreno v. Hanford Sentinel, Inc.*, 172 Cal. App. 4th 1125 (2009), the plaintiffs intentionally made the facts at issue available to practically anyone, thereby contradicting that they were genuinely private. Conversely, facts concerning Plaintiffs' sexual exploitation in this case are undoubtedly private. *Nicole Reisberg et al. v. Renaissance Learning, Inc.*, 2026 WL 2678223, at *8 (C.D. Cal. Sept. 11, 2026) ("disclosure of information connecting a person with sexual molestation" is "of the kind of sufficiently sensitive or intimate private fact which would be offensive and objectionable to the reasonable person"). Plaintiffs revealed their information (if at all) only to law enforcement. *See*, *id*. (private is "is not equivalent to secret" it is, rather, "the right to define one's circle of intimacy"). Thus, despite the cherry-picked quotes that superficially support Defendants' arguments, the legal reasoning they cite has no application to the facts at hand.

Next, Defendants distort the *Moreno* opinion to assert that they cannot be liable for disclosing Plaintiffs' information, even after it had been removed or redacted by DOJ. Mot. at 21-22. In *Moreno*, the plaintiff posted an "ode" on social media criticizing her hometown. Facing backlash from the community, she took it down. The court found that removal did not overcome the fact that she had already made it public. *Moreno*, 172 Cal. App. 4th at 1130. This is unlike what Plaintiffs allege here—that they had (and continue to have) a reasonable expectation of privacy regarding

the information at issue and had no control over the DOJ's initial disclosure. If anything, the DOJ's redactions should have increased, not decreased, Plaintiffs' reasonable expectation of privacy because the redacted information became unavailable from the DOJ website.

*2. The Information Disclosed Was Not Newsworthy*

As stated above, Google and xAI's First Amendment defense requires that the disclosure was "newsworthy." *See* § IV.A.2, above. The flipside of this requirement is that Plaintiffs must allege that the disclosed information was not newsworthy as an element of their invasion of privacy claim. *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 958 (9th Cir. 2013). The disclosures issue here were not newsworthy. They said nothing about the Epstein investigation, stating only private information about victims. ¶¶ 57-67, 75-81, 137, 181. Even if Defendants dispute this allegation, it cannot be resolved on the pleadings. "Whether a publication is or is not newsworthy depends upon contemporary community mores and standards of decency." *Diaz v. Oakland Trib., Inc.*, 139 Cal. App. 3d 118, 133 (Cal. Ct. App. 1983). "This is largely a question of fact, which a jury is uniquely well-suited to decide." *Id*. The only cases Defendants cite for this position prove Plaintiffs' point. *Shulman*, 18 Cal. 4th 200, was a ruling on summary judgment based on full record, and *Catsouras v. Dep't of California Highway Patrol*, 181 Cal. App. 4th 856 (2010), overturned an order sustaining a demurrer. Neither case favors early dismissal.

Even if the analysis Defendants urge were proper at this stage, the Plaintiffs would prevail. As was the case in *Gangland*, 730 F.3d 946, Plaintiffs here are connected to a matter of legitimate public interest, but that does not make them a matter of public interest. *Id*. at 960. The Ninth Circuit ruled in *Gangland* that that connection to a matter of public interest does not make one's identity newsworthy. *Id*. Even when a person herself has voluntarily assumed a public identity, for example by running for office (*Diaz*, 139 Cal. App. 3d 118) or working in modeling and entertainment (*Jackson*, 10 Cal. App. 5th 1240), she still retains privacy interests over matters pertaining to her identity and sexual history. Plaintiffs here plausibly allege that a chatbot's disclosure about an Epstein victim that says nothing about the Epstein investigation is not a matter of public interest. ¶¶ 137, 181. Ultimately, this is an issue for jury to decide.

*3. Plaintiffs Have a Privacy Right in Contact Information*

Finally, Google and xAI argue that Plaintiffs email addresses and phone numbers are "not private information" under *I.C. v. Zynga, Inc.*, 600 F. Supp. 3d 1034 (N.D. Cal. 2022). *I.C. v. Zynga* is an outlier. Numerous federal and state cases hold people have a constitutionally protected privacy right in their names, phone numbers, addresses, and email addresses. *See Padron v. Lara*, 2018 WL 2213462, at *14 (E.D. Cal. May 11, 2018) (ruling plaintiff had a "constitutionally protected right to privacy in his address and phone number under California law" and collecting several cases finding the same).

**E. Defendants' Attacks on Plaintiffs' Negligence Claims Ignore Plaintiffs Allegations**

*1. The Complaint Persuasively Alleges Misfeasance*

In California, "everyone is responsible for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person." *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 (2011) (citing Cal. Civ. Code § 1714(a)).

> To determine whether a defendant owes a plaintiff a duty of care under Section 1714(a), courts undertake a two-step inquiry. First, courts determine whether the defendant's entire conduct created a risk of harm to the plaintiff. If Section 1714(a) applies, courts then ask whether the resulting duty ought be narrowed or excepted based upon an analysis of the factors delineated in *Rowland v. Christian*, 69 Cal. 2d 108 (1968). [8]

*Doe v. Uber Techs., Inc.*, 2025 WL 80365, at *4 (9th Cir. Jan. 13, 2025). If the theory of liability involves "affirmative conduct" that "placed plaintiffs in a dangerous position and created a serious risk of harm to which they otherwise would not have been exposed," then the claim for negligence is one of misfeasance as opposed to nonfeasance and is governed by the standards of § 1714(a). *Lugtu v. Cal. Highway Patrol*, 26 Cal. 4th 703, 717 (2001).

Defendants contend the Court should dismiss Plaintiffs' negligence claim because it alleges nonfeasance rather than misfeasance, and that nonfeasance does not give rise to duty absent a special relationship. This is a manufactured defense that ignores the allegations in the Complaint. "The special relationship rule has no application if the plaintiff's complaint is grounded upon an affirmative act which created an undue risk of harm." *In re Salesforce*

---

[8] As Defendants do not argue that the *Rowland* factors narrow their duty, neither will Plaintiffs.

*Customers Sec. Incident Litig.*, 2026 WL 2691455, at *10 (N.D. Cal. Sept. 14, 2026). Here, Plaintiffs describe Defendants' chatbots as "active recommenders and content generators that package victim PII as part of a narrative output." ¶ 88. They actively created a harmful system of disclosure, rather than passively recirculating information. ¶¶ 55, 71, 74. They created new harms, including through the synthesis of information about Plaintiffs to create narratives about their identities and connection to the Epstein investigation. *See* ¶ 88. That is misfeasance, which imposes upon Defendants a general duty of care. *See* Cal. Civ. Code §1714; *Brown v. USA Taekwondo*, 11 Cal.5th 204, 214 (2021).

Even if the alleged conduct were nonfeasance, a special relationship would impose a duty. Courts in this district recognize a special relationship between data companies and the owners of the data. *See In re Accellion, Inc. Data Breach Litig.*, 713 F.Supp.3d 623 (N.D. Cal. Jan. 29, 2024) ("the Court's finding of a 'special relationship' between data companies and the owners of the data is also consistent with the holdings that many courts have reached"). That reasoning applies with greater force where, as here, Google and xAI created risk by authoring and publishing narratives from Plaintiffs' sensitive data. ¶¶ 22-23, 55, 58, 61, 71, 75, 79, 80. Considering this, even if the court finds that Plaintiffs' negligence theory rests on nonfeasance, a special relationship has been sufficiently alleged.

Contrary to Defendants' argument, the CCPA can serve as a duty of care. *In re Salesforce Customers Sec. Incident Litig*, 2026 WL 2691455, at *14 fn. 7 (a negligence claim can be predicated on the CCPA); *see also Stasi v. Inmediata Health Grp. Corp.*, 501 F.Supp.3d 898, 915 (S.D. Cal. Nov. 19, 2020) ("the burden of imposing a common law duty to protect personal information is not likely high given that both state and federal law already require such protection"). Given their existing statutory obligations under the CCPA, Defendants have a duty to prevent their products from facilitating the unauthorized dissemination of personal data. Considering this, the CCPA provides independent support for the imposition of a duty here.

*2. Plaintiffs Sufficiently Allege Proximate Causation & Damages*

Defendants argue that causation is too attenuated here because the DOJ made the information public, not them. Mot. at 24. But a defendant need not be the sole or original cause

of plaintiffs' harm; its conduct need only be a "substantial factor." *See Viner v. Sweet*, 30 Cal.4th 1232, 1239-40 (2003). As discussed, Plaintiffs allege that Defendants' synthesized disclosures caused harm to Plaintiffs. ¶¶ 22-23, 55, 58, 61, 71, 75, 79, 80. These exacerbated Plaintiffs' injuries, even after the DOJ withdrew Plaintiffs' information from the original disclosure. ¶¶ 58, 75, 80. These allegations sufficiently demonstrate Defendants' role in perpetuating the spread of this harmful information was a substantial factor in causing Plaintiffs' harm.

*3. Plaintiffs Validly Assert the CCPA Gives Rise to a Duty of Care*

Defendants' reliance on *Ginsberg v. Google Inc.*, 586 F.Supp.3d 998 (N.D. Cal. Feb. 18, 2022) is misplaced. In *Ginsberg*, the plaintiffs' allegation of a causal chain rested on a generalized fear of religiously-motivated violence from an app's availability on the Google play store. *Id*. at 1010. This was too attenuated to satisfy proximate cause. *Id*. Here, Defendants' outputs identified specific victims and provided the means to contact them, directly resulting in harassment and threats. ¶¶ 3, 57, 68, 76, 81-82, 91. Considering this, Plaintiffs establish a sufficient causal chain, and Defendants' argument must be rejected.

*4. A Claim for Negligent Infliction of Emotional Distress Is Warranted Here*

As an afterthought, Defendants move to dismiss Plaintiffs' claim under the theory Negligent Infliction of Emotional Distress because it is "not an independent tort." But in *Molien v. Kaiser Found. Hosps.*, the California Supreme Court held "that a cause of action may be stated for the negligent infliction of serious emotional distress." 27 Cal. 3d 916, 930 (1980). The claim is derivative of a negligence claim and only differs in that it seeks recovery for purely emotional injury. *Id*. Put differently, Plaintiffs can only succeed on a claim for negligent infliction of emotional distress if they prove negligence. To the extent it preserves emotional-distress damages under Plaintiffs' negligence claim, this claim should survive. *See Summers v. Delta Airlines, Inc.*, 805 F.Supp.2d 874 (N.D. Cal. Apr. 4, 2011).

## V. CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss. If any claim is inadequate, Plaintiffs respectfully request leave to amend to address the deficiency.

Dated this October 6, 2026.

Erickson Kramer Osborne LLP

*/s/ Kevin M. Osborne*

Julie C. Erickson
Elizabeth A. Kramer
Kevin M. Osborne
Attorneys for Plaintiffs JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4 and JANE DOE 5

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th of October, 2026, the foregoing PLAINTIFFS' OPPOSITION TO DEFENDANT GOOGLE LLC & X.AI CORP.'S JOINT MOTION TO DISMISS was filed and served using the CM/ECF system, which will serve as notification of such filings on all counsel of record.

/s/*Kevin M. Osborne*

Kevin M. Osborne
ERICKSON KRAMER OSBORNE LLP
959 Natoma St.
San Francisco, CA 94103
Phone: 415-635-0631
kevin@eko.law

Attorneys for Plaintiffs JANE DOE 1, JANE DOE 2, JANE DOE 3, JANE DOE 4, and JANE DOE 5